IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ANGELICA LOPEZ SANCHEZ | § | |
| | § | |
| v. | § | NO.  SA-12-CA-568-XR |
| | § | |
| MIRIAM LOPEZ SANCHEZ, ET AL. | § | |
| | § | |

**AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW**[1]

      Before the Court is Petitioner Angelica Lopez Sanchez's Verified Petition for Return of Child (Doc. 1.).  The Court held a hearing on July 13, 2012, at which the testimony of Petitioner and numerous other witnesses were heard.  At the conclusion of the hearing, the Court requested additional briefing.  Upon review of the testimony in this matter and the briefs submitted by all concerned, the Court enters the following Findings of Fact and Conclusions of Law.

**Findings of Fact**

1. Petitioner and Ramon Gonzalez are the parents of R.G.L. (Born 1998), S.I.G.L. (Born 1999) and A.S.G.L. (Born 2004).  The children were all born in the Republic of Mexico.

2. Petitioner is a resident of the Republic of Mexico.

3. From birth until June 9, 2011, the children continuously lived with their mother in Ciudad Juarez, Chihuahua, Mexico.

4. On or about June 9, 2011, the children's aunt, Miriam Lopez Sanchez, took the children from Ciudad Juarez to the El Paso, Texas residence of their uncle, Jose Enrique Lopez Sanchez.

5. Miriam Lopez Sanchez did not have Petitioner's permission to remove the children to Texas.  Alternatively, if Miriam did have permission to take the children to Texas, it was only for the purposes of a temporary visit.[2]

---

    [1] The name of Petitioner's sister is corrected in the Motion to Intervene analysis.

    [2]The extended family in this case highly contest how the children arrived inside the United States.  One family member argues that the aunt convinced the mother to allow the children to vacation in El Paso for two weeks and the mother agreed.  This is highly unlikely as the children arrived in El Paso with no luggage or extra clothes.  This supports the mother's

6. While in El Paso, Texas, the children resided in several locations, Miriam's home, and the home of someone named Antonio.

7. Despite several requests by the Petitioner, Jose Enrique Lopez Sanchez and Miriam Lopez Sanchez refused to return the children to Petitioner.

8. Eventually, on or about July 18, 2012, either Jose or Miriam took the children to the Santa Fe International Bridge for the purposes of returning the children. The children were dropped off at the bridge and instructed to walk across to the Mexican border. Petitioner and her boyfriend were on the other side waiting for the children. Rather than walk across the border, the oldest child Ramon decided he did not want to return to Mexico and he "handed" himself and his siblings to U.S. Immigration and Customs Enforcement (ICE) officials. The ICE officials detained the children on the U.S. side of the Santa Fe International Bridge. They were not accompanied by any adult.

9. Rather than return the children to Petitioner, ICE agents were advised that Miriam Lopez Sanchez made allegations that the children were abused by Petitioner's boyfriend, Arturo Quinonez. ICE officials decided that they could not return the children until the allegations of abuse could be determined.

10. ICE officials later transferred the children from an El Paso facility, to a Brownsville, Texas facility, and later to a U.S. Department of Health and Human Services, Office of Refugee Resettlement (ORR), Division of Unaccompanied Children's Services (DUCS) foster care facility in San Antonio, Texas. The Director of that facility is Asennet Segura.

11. On or about March 25, 2012, Petitioner filed applications for return of the children with the Mexican Central Authority. See Doc. 1.

12. On or about April 4, 2012, Petitioner filed a criminal complaint with law enforcement officials in Ciudad Juarez alleging that Miriam Lopez Sanchez and Jose Enriquez Lopez Sanchez wrongfully took her children.

13. On June 8, 2012, Petitioner filed her Verified Petition in this Court.

14. The United States and the Republic of Mexico are contracting states as defined under the Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980 (the "Hague Convention").

15. The Republic of Mexico was the children's country of habitual residence prior to June 2011.

---

version of events that the children were taken across the border without her prior consent and that she allowed the children to remain after the fact, but only for a brief stay.

2

16.     The children are currently physically located in the Western District of Texas, San Antonio Division.  Pursuant to an agreement between the U.S. Office of Refugee Resettlement, located within the U.S. Department of Health and Human Services, and Baptist Child and Family Services (BCFS), the children have been placed in a BCFS foster home.  The Respondent, Asennet Segura, is BCFS Executive Director of Residential Programs.  The names of the foster care parents who are physically caring for the children have not been disclosed.

17.     The Department of Homeland Security has instituted removal proceedings against the children.  Attorney Lee Teran and the St. Mary's Law School Clinic have entered appearances as attorneys for the children in those immigration proceedings.  At the request of the Petitioner/mother, attorney Marisa Balderas filed a motion to serve as the attorney for the children before the Immigration Court.[3]  The Immigration Judge denied the Petitioner/mother's motion for substitution of counsel.  On July 6, 2012, the St. Mary's Clinic filed I-589 asylum applications on behalf of the children.

18.     The Mexican Consulate General's office in San Antonio, Texas attempted to speak with their citizens/the children on various occasions.  The Consul General's office has been denied access to the Immigration Court proceedings when the Immigration Judge sealed the proceedings.  At other times either Ms. Teran or ORR representative Jose Gonzalez have limited what questions the Consul General's office may ask the children.[3]

19.     On July 11, 2012, the Refugee and Immigrant Center for Education and Legal Services (RAICES) through attorney Alexandra Minnaar, filed a Petition in Suit Affecting the Parent-Child Relationship in the 438th Judicial District Court of Bexar County, Texas.  In that suit it is requested that the state court find "that it is not in [the] best interests [of the children] to return to their parents' country of nationality, Mexico.  The children also request that the [state] court find that reunification with one or both of their parents is not

---

[3]See Executive Office for Immigration Review, A#200-188-064.

[3]The St. Mary's Clinic argues that this conduct did not violate the Vienna Convention on Consular Relations.  The Court makes no ruling on that issue.  The Court, however, had previously verbally ordered that the Consul's office be given access to the children.  Ms. Teran and Mr. Gonzalez violated the Court's order.  Ms. Teran claims that because she participated by phone when the verbal order was given, she did not hear the Court's ruling.  Apparently, no one informed ORR of the Court's order.  In the event that future cases such as this are filed, The Clinic, their attorneys and student advocates and ORR are placed on notice that Consul access is not be interfered with.  In addition, foreign diplomats shall be extended appropriate courtesies.  Various participants during these proceedings were cautioned about the tone and tenor of their questions directed towards the Mexican Consul's office.

viable due to abuse, abandonment, or neglect, or a similar basis under state law."[4] RAICES has a contractual agreement with the Republic of Mexico's Consulate in San Antonio to provide certain legal services in Texas for its citizens. The Republic of Mexico has not authorized the filing of this state lawsuit and opposes same.

20. The Young Center for Immigrant Children's Rights at the University of Chicago has sent this Court a letter claiming that it has been appointed by the ORR as the Child Advocate for the three children. See Doc. No. 21-5. They argue that returning the children to Mexico would pose a grave risk of physical and psychological harm because Arturo Quinonez, who it claims is the children's stepfather[5], is a violent person, beats the mother and the children and that the drug cartel Los Aztecas has threatened the family because of Arturo Quinonez.

21. Pursuant to Article 3 of the Convention the children are wrongfully retained by Respondent. Petitioner possessed rights of custody, either jointly or alone, under the law of the State in which the children were habitually resident immediately before the removal or retention; and at the time of removal or retention those rights were actually exercised by Petitioner, either jointly or alone, or would have been so exercised but for the removal or retention.

22. Pursuant to Article 13, Respondent has failed to establish that there is a grave risk that the children's return would expose the children to physical or psychological harm or otherwise place the children in an intolerable situation. Advocates for the children argue that the following, either individually or in combination, would expose the children to physical or psychological harm or otherwise place the child in an intolerable situation: (1) the Petitioner's boyfriend[6] subjects Petitioner to physical domestic abuse by either physically striking her various times a week or is verbally abusive to Petitioner; (2) the Petitioner's mother once saw her daughter's face "black and blue" from hits inflicted by the boyfriend; (3) Petitioner's boyfriend uses drugs (marijuana use and ingesting some form of pills for "nerves") in the home; (4) the boyfriend has hit the two oldest children with a belt and his hand; (5) the boyfriend has required that the children assist him in

---

[4]See 2012-CI-11235.

[5]Petitioner testified that she and Arturo are not married. Petitioner also claims that she separated from Arturo about 7 weeks ago and now lives with her father.

[6]Petitioner has been in an on and off relationship with Arturo Quinonez for years. He was convicted in Oklahoma in 1989 and 1997 for assault with a deadly weapon. On October 2, 1998 Shannon Danelle Quinonez secured a divorce from Arturo. The state district court in Oklahoma found that Arturo was "dangerous to the physical well-being of [Shannon] and the minor children and that he should be restrained from harassing, molesting or interfering with the peaceful existence of [Shannon] or the minor children...." Case No. FD-96-1332.

    washing cars and seldom pays them; (6) the boyfriend sells marijuana and may be hiding drugs for cartel members at the home; (7) Ramon's father failed to secure medical treatment on one occasion when Ramon was injured in a vehicle accident[7]; and (8) Petitioner has caused the children to miss school because of financial problems.[8]

23.    Respondent has failed to establish that Article 20 is applicable (provides that the return of the children may be refused if this would not be permitted by the fundamental principles relating to the protection of human rights and fundamental freedoms).

## Analysis

**Motion to Intervene**

    The St. Mary's School of Law Center for Legal and Social Justice Immigration and Human Rights Clinic (attorneys Lee Teran, Albert Kauffman, Adriane Meneses) seeks leave to intervene on behalf of the three children. Doc. 11. The motion states that the minor children seek to appear in this action through Alex Hernandez as Next Friend. Alex Hernandez is married to Maria Hernandez. Ms. Hernandez is Petitioner's sister. Alex Hernandez is not related by blood to the children. Neither he nor any of the attorneys listed above have been appointed by any Texas court as attorneys or guardians at litem for the children. Ms. Hernandez testified that she has not authorized anyone to initiate any legal action for the children. Petitioner and the children's father have likewise not authorized Alex Hernandez or any of the attorneys listed above to initiate any legal action on behalf of the children. As discussed below, this action runs counter to the objectives set forth in Hague Convention. The motion is denied.[9] Likewise, the motions for admission pro hac vice filed by attorneys Aguilar and Meneses are denied. Doc. Nos. 12 and 13.

**Motion to Dismiss**

    The proposed intervenors mentioned above filed a motion to dismiss arguing that this Court lacked jurisdiction Alternatively, they sought dismissal arguing that the Department of Homeland Security has exclusive legal control of the children pursuant to 8 U.S.C.A. § 1232.[10]

---

    [7]Ramon's mother promptly secured medical attention for him.

    [8]In oral argument, the St. Mary's Clinic argued that the youngest child may have been required to transport drugs for Arturo. No evidence was produced to substantiate that allegation.

    [9]Ms. Teran and the St. Mary's Clinic argue that they are representing the children in the Immigration Court proceedings pursuant to 8 U.S.C. § 1232(c)(5).

    [10]Any unaccompanied alien child who is a national or habitual resident of a country that is contiguous with the United States shall be treated in accordance with subparagraph (B), if the Secretary of Homeland Security determines, on a case-by-case basis, that--

As stated above, the proposed intervenors have no standing or authority to file motions on behalf of the children. The motion is dismissed for that reason. Alternatively, for the reasons set forth below, the Court has jurisdiction in this case. Further, 8 U.S.C. § 1232 is not applicable in this case. No one has advanced any argument or testimony that the children have been victims of a severe form of trafficking in persons, and there is no credible evidence that the children are at risk of being trafficked upon return to the child's country of nationality or of last habitual residence. Accordingly, in the alternative, the motion to dismiss is denied.

Although the Court has denied the motions from the proposed intervenors and the above named attorneys, the Court nevertheless will evaluate the arguments they raised during the hearing and the briefs (and exhibits) that they submitted as the Court evaluates whether any exceptions to the Hague Convention apply.

**Proposed Intervenors' Motion to Appoint Attorney or Guardian ad litem**

Ms. Teran and the St. Mary's Clinic argue that inasmuch as they serve as counsel for the children in the immigration proceedings, they should be appointed as attorneys ad litem in this matter as well. Alternatively, they request that the Court appoint alternative attorneys or guardians ad litem. As addressed more fully below the function of this Court is to determine whether the Hague Convention provisions have been met, and whether any exceptions thereto apply. This Court does not sit as an immigration court to determine whether the children are entitled to asylum. Nor does this court sit as a state court to determine what the "best interests" of the children may be. The Hague Convention also anticipates that these proceedings would take place expeditiously. The Court finds that given the courtesies extended to Ms. Teran and the St. Mary's Clinic to participate in the evidentiary hearing and to submit briefing and exhibits, an appointment is not necessary. As stated above, the Court will review the argument, testimony and briefing submitted from all concerned parties to determine whether any exceptions to the Hague Convention apply in this case. The motion is denied. Doc. No. 35.

**Petitioner's Motion for Judgment on the Pleading**

Petitioner filed a motion for judgment on the pleading seeking judgment because the Respondents never filed an answer to the Petition. An answer was filed on July 13. See doc. No. 27. The Court denies the motion on this ground and will review whether any exceptions to the Hague Convention apply. Docket number 22 is denied.

---

(I) such child has not been a victim of a severe form of trafficking in persons, and there is no credible evidence that such child is at risk of being trafficked upon return to the child's country of nationality or of last habitual residence;
(ii) such child does not have a fear of returning to the child's country of nationality or of last habitual residence owing to a credible fear of persecution; and
(iii) the child is able to make an independent decision to withdraw the child's application for admission to the United States.

**ORR's Motion to Hold this Case in Abeyance**

The U.S. Department of Health and Human Services, Office of Refugee Resettlement ("ORR") has filed a motion stating that it believes this Court has jurisdiction based on the Hague Convention and that the proceedings before the Immigration Court do not automatically preempt or stay any of this Court's rulings.  Nevertheless, the ORR requests that, as a prudential matter, this Court should stay any ruling in this case until such time as the Immigration Court rules on the pending asylum applications.  The ORR Motion informs the Court that the July 6 asylum applications were rejected[11] by the Immigration Court for procedural reasons.  But that "the asylum applications, if re-filed, may shed light on the Court's determination of whether the children face a grave risk of harm, as referred to in Article 13 of the Hague Convention.  It may also provide information relevant to the Court's determination [regarding Article 20] ...."  The motion further states: "The United States does not have a position on whether there is a grave risk that the children's return would expose them to physical or psychological harm or otherwise place them in an intolerable situation."  See Doc. No. 43.

The participants in this case have represented to the Court that based on their experience practicing before the immigration courts that it could take the immigration court as long as six months to issue a ruling.  The Court further notes that, to date, the mother and the Mexican Consulate have been denied the right to participate in the immigration proceedings.

Petitioner opposes the motion arguing that the U.S. Government has held the children for more than thirteen months already, the asylum application could take another six months to a year, and that there is no certainty that an asylum application will be granted.

Because this motion to abate runs counter to the mandate that Hague Convention petitions be handled as expeditiously as possible[12], the motion to abate is denied.

**The Hague Convention, generally**

This case arises under the Hague Convention on the Civil Aspects of International Child Abduction ("the Convention"), Oct. 24, 1980, T.I.A.S. No. 11670, S. Treaty Doc. No. 99-11.  The Convention seeks "to secure the prompt return of children wrongfully removed to or retained

---

[11]That information was never previously supplied to this Court.  In their July 31 filing, Ms. Teran and the St. Mary's Clinic informs the Court that they re-filed the asylum applications on July 30.  See Doc. No. 47.

[12]*Larbie v. Larbie*, --- F.3d ----, 2012 WL 3089773 (5th Cir. 2012) ("The Convention has two primary 'objects': (1) 'to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and' (2) 'to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.' Convention art. 1.").

in any Contracting State," and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Art. 1, Treat Doc., at 7.

The Convention provides that a child abducted in violation of "rights of custody" must be returned to the child's country of habitual residence, unless certain exceptions apply. *Abbott v. Abbott*, 130 S. Ct. 1983, 1987 (2010). The Convention is based on the principle that the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence. *Id.* at 1995. Ordering a return remedy does not alter the exiting allocation of custody rights, but does allow the courts of the home country to decide what is in the child's best interests. *Id.*

As explained by the Supreme Court in *Abbot*, 130 S. Ct. at 1989 (citations omitted):

> The Convention's central operating feature is the return remedy. When a child under the age of 16 has been wrongfully removed or retained, the country to which the child has been brought must "order the return of the child forthwith," unless certain exceptions apply. A removal is "wrongful" where the child was removed in violation of "rights of custody." The Convention defines "rights of custody" to "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." A return remedy does not alter the pre-abduction allocation of custody rights but leaves custodial decisions to the courts of the country of habitual residence. The Convention also recognizes "rights of access," but offers no return remedy for a breach of those rights.

The United States is a contracting state to the Convention, and Congress has implemented its provisions through the International Child Abduction Remedies Act ("ICARA"), 102 Stat. 437, 42 U.S.C. §§ 11601 *et seq*. The statute authorizes a person who seeks a child's return to file a petition in state or federal court, and instructs that the court "shall decide the case in accordance with the Convention." 42 U.S.C. §§ 11603(a), (b), (d). Suit should be filed in a court in the jurisdiction where the child is physically located. 42 U.S.C. § 11603(b). If the child in question has been "wrongfully removed or retained within the meaning of the Convention," the child shall be "promptly returned," unless an exception is applicable. *Id.* (citing § 11601(a)(4)).

**Existence of other custody proceedings**

"For purposes of the Convention, it is irrelevant whether there is a custody dispute concerning that child pending at the time of removal." *Sealed v. Sealed*, 394 F.3d 338, 343 (5th Cir. 2004); *see also Abbott*, 130 S. Ct. at 1988 (noting that divorce/custody suit remained pending in state court).

If there is a pending state court action which is attempting to litigate custody, Article 16

8

of the Convention provides that the state court action "shall not decide the merits of rights of custody until it has been determined that the child is not to be returned" under the Convention.

"Children who otherwise fall within the scope of the Convention are not automatically removed from its protections by virtue of a judicial decision awarding custody to the wrongdoer. This is true whether the decision as to custody was made, or is entitled to recognition, in the State to which the child has been taken.  Under Article 17 that State cannot refuse to return a child solely on the basis of a court order awarding custody to the alleged wrongdoer made by one of its own courts or by the courts of another country.  This provision is intended to ensure, *inter alia*, that the Convention takes precedence over decrees made in favor of abductors before the court had notice of the wrongful removal or retention."   Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10503-10506 (1986) ((hereinafter Convention Analysis).

The Convention is designed to restore the pre-abduction status quo. *Sealed v. Sealed*, 394 F.3d 338, 344 (5th Cir. 2004).  The Convention is not concerned with establishing the person to whom custody of the child will belong at some point in the future; it seeks, more simply, to prevent a later decision on the matter being influenced by a change of circumstances brought about by the unilateral action by one of the parties. *Id.* (quoting Explanatory Report to the Convention ¶ 71, at 447-48).  To this end, the Convention prohibits courts in countries other than that of the child's habitual residence from adjudicating the merits of the underlying custody dispute. *Id.*

**Hague Convention provisions**

Article 3 of the Convention states: The removal or the retention of the child is to be considered wrongful where–

> *a* it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.
>
> The rights of custody mentioned in sub-paragraph *a* above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.
>
> Article 5 of the Convention states: For the purposes of this Convention-
>
> *a* 'rights of custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence;

>  b 'rights of access' shall include the right to take a child for a limited period of time to a place other than the child's habitual residence.

<u>Article 12</u> of the Convention states: Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.

<u>Article 13</u> provides: Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that –

>  *a* the person, institution or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention; or

>  *b* there is a grave risk that his or her return would expose the child to psychical or psychological harm or otherwise place the child in an intolerable situation.

>  The judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views.

>  In considering the circumstances referred to in this Article, the judicial and administrative authorities shall take into account the information relating to the social background of the child provided by the Central Authority or other competent authority of the child's habitual residence.

<u>Article 20</u> provides that "[t]he return of the child under the provisions of Article 12 may be refused if this would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms."

**Petitioner's case**

The parent seeking return of the child must prove that the child's removal or retention was wrongful within the meaning of the Convention by a preponderance of the evidence. 42 U.S.C. § 11603(e)(1)(A). A person wrongfully removes a child when he or she removes or retains the child outside the child's country of habitual residence, and this removal: breaches the rights of custody accorded to the parent under the laws of that country; and, at the time of removal, the non-removing parent was exercising those custody rights. Convention, art. 3. *Sealed v. Sealed*, 394 F.3d 338, 343 (5th Cir. 2004); *see also Abbott*, 130 S. Ct. at 1990 (a child is "wrongfully removed" if he was removed in violation of a right of custody).

<u>country of habitual residence</u>

Neither the Convention nor ICARA define "habitual residence."  A child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a "degree of settled purpose" from the child's perspective.  *Van Driessche v. Ohio-Esezeoboh*, 466 F. Supp. 2d 828, 842 (S.D. Tex. 2006) (*citing Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995).

<u>rights of custody</u>

The Convention recognizes that custody rights can be decreed jointly or alone, and defines "rights of custody" to "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence."  *Abbott*, 130 S. Ct. at 1990.  The phrase "place of residence" encompasses the child's country of residence. *Id.*  The right to choose the child's country of residence is a right "relating to the care of the person of the child." *Id.* at 1991.

Pursuant to Article 3 of the Convention, rights of custody may arise from operation of law, from a judicial or administrative decision, or from a legally binding agreement.

When no formal custody agreement exists between the parents, courts must apply the laws of the country of the child's habitual residence to determine if the non-removing parent had "rights of custody" within the meaning of the Convention.  *Sealed v. Sealed*, 394 F.3d 338, 343 (5th Cir. 2004).  Children who are wrongfully removed or retained prior to the entry of a custody order are protected by the Convention; there need not be a custody order in effect to invoke the Convention's return provisions.  Department of State Guidance, 51 Fed. Reg. 10494.

When the country has more than one territorial unit, the habitual residence refers to the particular territorial unit in which the child was resident, and the applicable laws are those in effect in that territorial unit.  Hague Convention, Article 31.  Mexican choice of law rules require that Mexico apply the law of the Mexican State in which the child was habitually resident immediately prior to the child's removal.  *Whallon v. Lynn*, 230 F.3d 450, 456 n.6 (1st Cir. 2000); *but see A.A.M. v. J.L.R.C.*, 840 F. Supp. 2d 624 (E.D. N.Y. 2012) ("Mexico's federal law governs with respect to the scope of petitioner's custody rights for Convention purposes, and supersedes any Mexican state's law to the contrary.  *See*, *e.g.*, José Antonio Márquez González, Family Law in Mexico 80 n.1 (2011) (noting that the code of the Mexican State of Puebla does not define the concept of "parental authority," the Mexican analog to the American law of custody.").  The state of Chihuahua, pursuant to article 391 of that state's Civil Code, recognizes the doctrine of patria potestas.  Pursuant to that doctrine both parents have joint custody rights.

11

      exercise of rights of custody

      The Convention protects rights of custody when "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." *Abbott*, 130 S. Ct. at 1991. The petitioner must allege that he or she actually alleged his or her custody rights at the time of the breach or would have exercised them but for the breach.

      The determination whether a party is exercising custody rights closely parallels the determination of the nature and dimension of those rights. *Sealed v. Sealed*, 394 F.3d 338, 344 (5th Cir. 2004). Courts charged with deciding "exercise" under the Convention must not cross the line into consideration of the underlying custody dispute. *Id.* To avoid this possibility, American courts interpret "exercise" broadly, and thus, in the absence of a ruling from a court in the country of habitual residence, when a parent has custody rights under the laws of that country, even occasional contact with the child constitutes "exercise" of those rights." *Id.* at 345. "To show failure to exercise custody rights, the removing parent must show the other parent has abandoned the child." *Id.*

**Respondent's case**

      Even if the child has been wrongfully removed or wrongfully retained, a return order is not automatic. Return is not required if the Respondent can establish that a Convention exception applies. *Abbott*, 130 S. Ct. at 1997. If a petitioner shows by a preponderance of the evidence that the removal or the retention of the child was wrongful, see 42 U.S.C. § 11603(e)(1), the burden shifts to a respondent to prove an applicable affirmative defense. Several such defenses are available if a respondent "opposes the return of the child." 42 U.S.C. § 11603(e)(2).

      A respondent may show by clear and convincing evidence that there is a "grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b); see 42 U.S.C. § 11603(e)(2)(A).

      A respondent may show by clear and convincing evidence that the return of the child "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." Hague Convention, art. 20; see 42 U.S.C. § 11603(e)(2)(A).

      grave risk of physical or psychological harm

      Article 13(b) provides an exception to return in the event of a "grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." A party opposing a child's return must prove the existence of a grave risk by clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A).

Even if this "narrow" exception applies, a federal court has "and should use when appropriate" the discretion to return a child to his or her place of habitual residence "if return would further the aims of the Convention." *England v. England*, 234 F.3d 268, 271 (5th Cir. 2000) (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir. 1996)).

Evidence of adjustment problems attending relocation and separation from a parent are inapposite to the grave risk determination. *England*, 234 F.3d at 271; *Morrison v. Dietz*, 2008 WL 4280030 (W.D. La. 2008), *aff'd on other grounds*, 349 Fed. Appx. 930 (5th Cir. 2009).

The Department of State Guidance states that "[t]his provision was not intended to be used by defendants as a vehicle to litigate (or relitigate) the child's best interests. Only evidence directly establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation is material to the court's determination. The person opposing the child's return must show that the risk to the child is grave, not merely serious." Convention Analysis.

"[W]hile all jurists would agree that some level of domestic abuse will trigger the Article 13b exception, the more difficult question is at precisely what level will return expose the child to a 'grave risk of harm or place the child in an 'intolerable situation'?" *Simcox v. Simcox*, 511 F.3d 594, 605 (6th Cir. 2007). The Sixth Circuit stated that there is no clear answer, though it had favorably cited a State Department report that states, "The person opposing the child's return must show that the risk to the child is grave, not merely serious." *Id.* (citing *Friedrich II*, 78 F.3d at 1068 (citing Public Notice 957, 51 Fed. Reg. 10494, 10510 (March 26, 1986)). The same report also noted that "[a]n example of an 'intolerable situation' is one in which a custodial parent sexually abuses the child" because such circumstances would constitute "a grave risk of psychological harm." *Friedrich II*, 78 F.3d at 1069.

In *Vazquez v. Estrada*, Civ. A. No. 3:10-CV2519, 2011 WL 196164 (N.D. Tex. Jan. 19, 2011), the removing parent argued that returning the child to Mexico would expose her to a grave risk of physical harm due to the "spiraling violence and surge in murders in Monterrey" and because of "specific violent acts that have been committed in the school [the child] attended in Monterrey and in the neighborhood where Petitioner resides." The court found that the removing parent failed to establish the exception by clear and convincing evidence:

> Like the other defenses, the grave risk defense must be narrowly construed. The defense was not intended to encompass situations such as the return to a home where money is in short supply or where educational opportunities are more limited. Instead, a grave risk or intolerable situation exists where return of the child would send the child to a "zone of war, famine, or disease," or in cases of serious abuse or neglect.
>
> Respondent provided evidence that there has been a surge of violent activity in Monterrey due to drug cartel activity and that the neighborhood where Petitioner

> lives is dangerous. This is not sufficient to find that Monterrey is a "zone of war." *See Silverman*, 338 F.3d at 900-01 (finding that general regional violence in Israel does not establish a "zone of war"); *Mendez Lynch v. Mendez Lynch*, 220 F. Supp. 2d 1347, 1365-66 (finding civil instability and presence of violent demonstrations in Argentina did not amount to a "grave risk" or "intolerable situation"). Respondent has failed to establish by clear and convincing evidence that a grave risk of physical harm exists.

*Id.* at *5 (some citations omitted); *see also Avendano v. Smith*, 2011 WL 5223041, at *22 (D. N.M. Aug. 19, 2011) ("Although Mexico is more dangerous than the United States at this time, the term intolerable situation was not meant to encompass return to a home where living conditions are less palatable.").

In *Silverman v. Silverman*, 338 F.3d 886, 901 (8th Cir. 2003), the Eighth Circuit held that evidence of "general regional violence, such as suicide bombers, that threatened everyone in Israel" was not sufficient to establish a "zone of war" that put the children in "grave risk of physical or psychological harm" under the Convention.

The Seventh Circuit recently re-emphasized that "[c]oncern with comity among nations argues for a narrow interpretation of the 'grave risk of harm' defense; but the safety of children is paramount. Because the court in this sort of case is responsible for determining which country's courts should adjudicate the domestic dispute and not resolving the dispute itself, we have stressed that the risk of harm must truly be grave. The respondent must present clear and convincing evidence of this grave harm because any more lenient standard would create a situation where the exception would swallow the rule." *Norinder v. Fuentes*, 657 F.3d 526, 535 (7th Cir. 2011) (internal quotations and citations omitted).

<u>Article 20</u>

This exception was intended to be narrowly applied and is not to be used "as a vehicle for litigating custody on the merits or for passing judgment on the political system of the country from which the child was removed." Department of State Guidance, 51 Fed. Reg. 10494. The "language of Article 20 has no known precedent in other international agreements to serve as a guide in its interpretation." Public Notice 957, 51 Fed. Reg. 10494, 10511 (March 26, 1986). "Consequently, so as to be able to refuse to return a child on the basis of this article, it will be necessary to show that the fundamental principles of the requested State concerning the subject-matter of the Convention do not permit it; it will not be sufficient to show merely that its return would be incompatible, even manifestly incompatible, with these principles. Secondly, such principles must not be invoked any more frequently, nor must their invocation be more readily admissible than they would be in their application to purely internal matters." *Id.*

## Conclusions of Law

Pursuant to Article 3 of the Convention the children are being wrongfully retained by Respondent. Petitioner possessed rights of custody, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and at the time of removal or retention those rights were actually exercised by Petitioner, either jointly or alone, or would have been so exercised but for the removal or retention.

Respondent must establish that there is a grave risk that the child's return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation. It is not enough to put forward evidence of past acts of domestic abuse or past drug activity in the home. Petitioner has testified that she has severed her ties with her former boyfriend and has moved to a new home. There has been testimony that Petitioner has previously separated from her boyfriend and has reconciled with him, only to fall prey to domestic abuse again. This is a disturbing pattern. This is not an easy case. If this Court were analyzing what is in the "best interests" of the children, it is easy to conclude that the children are well cared for now, attending good schools and living in an safe and comfortable environment. The "best interests" standard, however, is not the standard that this Court is required to apply. Petitioner testified that she understands the children do not want any association with her former boyfriend and that she has concluded that her children are more important to her than her relationship with Mr. Quinonez. Neither the children, nor any other interested party, have raised concerns that the children will suffer physical or psychological harm by returning the children to their mother (assuming that Mr. Quinonez is no longer present). The Mexican Government has presented evidence that they have an agency similar to the Texas Department of Child Protective Services and can monitor any claims of abuse or neglect. The attempted intervenors' argument that "the country of habitual residence ... may be incapable or unwilling to give the child[ren] adequate protection" must be measured against the Hague Convention goals and deference to a sovereign foreign country.

The attempted intervenors also argue that under Article 13, the two oldest children have attained an age and degree of maturity to opine that they do not wish to be returned to Mexico. The Court has considered this argument and met with the two oldest children in chambers. Although bright and well-mannered, the children have just completed fifth and eighth grades. Although they wish to remain in the United States, there is no certainty that the Immigration Court will actually grant any asylum application. The children's preferences are based on animosity towards their mother's boyfriend. They have not expressed to the Court any concern about their mother. They recognize that their financial and comfort level living in San Antonio exceeds what they formerly enjoyed in Ciudad Juarez. They, understandably, do not want to give up their current lifestyle.

This case is further complicated by the applications for asylum filed and the request by ORR that these proceedings be abated. Additionally, the case is further complicated by the recent state court lawsuit claiming that the children were subjected to neglect.

Pursuant to Article 13, Respondent has failed to establish by clear and convincing evidence that there is a grave risk that the child's return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.  The age of maturity exception also fails.

Respondent has failed to establish that Article 20 mandates denial of Petitioner's Petition for the return of the children.

Petitioner's motion for return of the children is GRANTED.  The Motion to Intervene (doc. no. 11) is denied.  The motions to Appear Pro Hac Vice (doc. nos. 12 and 13) are denied.  The motion to dismiss (doc. no. 20) is denied.  The motion to appoint a guardian or attorney ad litem (doc. no. 35) is denied.  The motion to stay case (doc. no. 44) is denied.

Accordingly, because the Court finds that the habitual residence of the minor children is the Republic of Mexico and that Respondent's retention of the children in the United States is wrongful, the Court ORDERS that the minor children be returned forthwith to the custody of Petitioner.  The Clerk is directed to issue Judgment in accordance with this Order.

It is so ORDERED.

SIGNED this 30th day of October, 2012.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE