IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| ANGELICA LOPEZ SANCHEZ | § | |
| --- | --- | --- |
| v. | § | NO. SA-12-CA-568-XR |
| | § | |
| MIRIAM LOPEZ SANCHEZ, ET AL. | § | |

**Background**

On June 8, 2012, Petitioner filed her Verified Complaint in this Court. Docket No. 1. This court held a hearing and an evidentiary hearing[1], interviewed two of the children, and subsequently entered an order dated August 3, 2012, finding that the habitual residence of the minor children is the Republic of Mexico, that the retention of the children in the United States is wrongful, that Respondent had failed to establish by clear and convincing evidence that there is a grave risk that the children's return would expose the children to physical or psychological harm or otherwise place the children in an intolerable situation, and that Respondent had failed to establish that Article 20 of the Hague Convention mandated denial of Petitioner's Petition. Accordingly, this Court ordered that the minor children be returned to the custody of Petitioner. See docket no. 49.

The above Order (as amended for a nonsubstantive error) was appealed to the court of appeals. See docket no. 74. On June 5, 2014, the Fifth Circuit concluded that some agency or entity of the United States government should be joined as a party to this litigation, and the children should be appointed a guardian ad litem. In addition, since the United States Citizenship and Immigration Services (USCIS) granted asylum to the children while this matter

---

[1] June 20, 2012, July 13, 2012.

1

was on appeal, the Fifth Circuit directed this Court to "consider the asylum grants, assessments, and any related evidence not previously considered that relates to whether Article 13(b) or 20 applies." *Sanchez v. R.G.L.*, 761 F.3d 495 (5th Cir. 2014).

In compliance with the directives issued by the Fifth Circuit, this Court has ascertained that the children are in the physical custody of Baptist Child & Family Services Foster Care (BCFS), a grantee of the U.S. Department of Health and Human Services, Office of Refugee Resettlement (ORR) to benefit children in the Unaccompanied Alien Children Program (UACP). Accordingly, both BCFS and the Secretary of the U.S. Department of Health and Human Services have been joined in these proceedings as parties.

In addition, the Court has appointed attorney Patricia DeVeau as guardian ad litem. See docket no. 81.

Finally, this Court directed all concerned parties and attorneys to produce the "asylum grants, assessments, and any related evidence not previously considered that relates to whether Article 13(b) or 20 applies." See docket no. 80. The parties and various counsel have provided numerous documents, which the Court has reviewed in chambers.

**Information supplied to the District Court prior to the USCIS grant of asylum and the appeal to the Fifth Circuit**

During the evidentiary hearing held on July 13, 2012, the oldest child testified that his "stepfather"/mother's boyfriend was Arturo Quinones. He testified that Arturo[2] would oftentimes hit his mother, would sometimes come home "high on drugs," he would roll or smoke marijuana cigarettes outside the home, he would ingest some unspecified pill for "nerves," and

---

[2] Arturo's last name is spelled differently in the various documents filed in this case. He will hereinafter be generally referred to as Arturo.

about three times a week Arturo would hit him or his brothers with a belt or his hand. RGL also testified that Arturo would require him and the middle child to work at a parking lot. RGL testified that he missed about two years of school because there was an insufficient amount of money to pay for his schooling. RGL testified that Arturo sold marijuana in Ciudad Juarez. The middle child testified that Arturo would frequently curse and yell. SIGL testified that Arturo only kicked him once in the buttocks when he did not do some chore. SIGL testified that he saw Arturo smoke marijuana cigarettes at home. SIGL testified that he missed part of the fourth grade because his family moved because someone was threatening to kill Arturo. SIGL testified that Arturo became abusive towards his mother about once a month. SIGL denied that his mother has ever been abusive towards him. SIGL testified that he believed gang members with pistols would sometimes go to his home to purchase marijuana. He expressed a fear that his mother would be kidnapped.

A diplomatic representative of the Republic of Mexico testified that it was the official position of Mexico that the children should be returned to the children's mother in Mexico.[3] The Mexican Consul also testified that Mexican law enforcement authorities had done a background check on Arturo and the children's home and nothing unusual was discovered.

The children's mother testified and denied any domestic abuse had taken place, denied that Arturo used drugs in the home, and denied that Arturo sold drugs from their home. She also testified that she was no longer living with Arturo and left him about June 2012, inasmuch as the children did not want to be with him anymore. She testified that she was living with her father.

---

[3] The Mexican government also lodged various protests about being denied free and open access to their citizens, allegedly because of the interference by various attorneys representing the children in this proceeding and the immigration proceedings.

Petitioner's sister, Maria Isabel Hernandez, testified at some length as to whether the children had been kidnapped, or were brought and remained in the United States with the mother's consent. Nonetheless, Ms. Hernandez testified that Petitioner repeatedly told her she wanted the children returned to Mexico, that she had never met Arturo, and that she never gave permission for a lawsuit to be filed in a Texas state court seeking conservatorship of the children.[4]

The Petitioner's mother (grandmother of the children) testified that her daughter and Arturo regularly fought, that Arturo would oftentimes hit Petitioner, and the children were mistreated by being required to wash cars and pick up scrap cans for money. She further testified that Angelica separated from Arturo on a number of occasions, but that she would always return to living with him.

The "Intervenors[5]" in this case provided the Court with U.S. law enforcement records, Oklahoma court records, and Oklahoma divorce records regarding Arturo Quinonez. Arturo Quinonez aka Arturo Guerro (date of birth January 31, 1968) was sentenced in Oklahoma for assault and battery with a dangerous weapon on June 19, 1996 and sentenced to five years of imprisonment in the Oklahoma Department of Corrections. An investigative report indicates that Arturo threw a bottle from a car window at a 50-year old jogger, and then beat the victim with a shovel and bat. On June 26, 1989, Arturo was given a 10-year suspended sentence for shooting with intent to kill. Prior to the above offenses, Arturo was given a five-year suspended sentence

---

[4] An Original Petition in Suit Affecting the Parent-Child Relationship was filed in the 438th Judicial District Court of Bexar County, Texas. The lawsuit was filed on behalf of the children by the Refugee and Immigrant Center For Education and Legal Services (RAICES). The lawsuit requested that the children remain in the custody of the ORR. Alternatively, the lawsuit sought that the children's maternal aunt, Maria Hernandez and her husband, Alejandro Hernandez, be named joint managing conservators.

[5] The three children involved in this case sought leave to intervene and that motion was filed by the St. Mary's School of Law Center for Legal and Social Justice (lead counsel is Lee J. Teran).

for possession of marijuana with intent to distribute. He acknowledged using barbiturates, cocaine, propoxyphene and marijuana between the ages of 15 to 18. An FBI report indicates that Arturo allegedly has been previously arrested for possession of an illegal firearm, assault with intent to kill, and harassing a state witness. On October 2, 1998, a Decree of Divorce was signed granting a divorce between Shannon Danelle Middleton and Arturo. Ms. Middleton was granted custody of their two children. That court found that Arturo was "dangerous to the physical well-being" of Middleton and the two children and was restrained from "harassing, molesting, or interfering" with their "peaceful existence." Arturo was also denied any contact or visitation with those minor children.

The Intervenors also filed various psychological assessments. On July 19, 2012, the children were referred to a psychologist (Ruth Bujanda-Moore) by the St. Mary's Law School Immigration Clinic. RGL was interviewed, and during that interview he stated that he was afraid of his step-father (Arturo), that Arturo was physically, verbally and emotionally abusive, that he was involved in the Aztecas gang, that Arturo was abusive towards his mother, that his mother would leave him on many occasions, but would return, and that Arturo has threated to kill his mother, him, and his brothers. RGL claimed that Arturo offered him and his brother beer, marijuana and other drugs. RGL also claimed that Arturo would show him and his brother videos of "criminal atrocities" that a cartel had engaged in. RGL also claimed that Arturo owed money to the Aztecas, that the gang had murdered one of Arturo's friends, and that the cartel had threatened his family.[6] RGL claimed that he and his brothers had been attending school, but the family ran out of money to buy school supplies and that Arturo put him and his brothers to work

---

[6] The Court notes that many of the areas of concern expressed in this assessment were not raised by RGL in his interview with the undersigned judge. In addition, no witness actually testified to any of these allegations stated by the children to the psychologist, who also did not testify in these proceedings.

collecting scrap metal. RGL was diagnosed with suffering from Post-Traumatic Stress Disorder. The psychologist recommended that he not be returned to Mexico because he would be at grave risk of physical or psychological harm if he is returned.

A DHS Form I-213 was prepared on June 19, 2011. A Customs and Border Patrol agent indicates that at the Juarez Bridge in El Paso, Texas, at approximately 2045 hours, RGL (DOB 2/1/1998) and his two younger brothers approached a Border Patrol agent asking for help. RGL claimed that he and his brothers had been smuggled into the United States "by a friend of their mother identified only as Tonio."[7] RGL further stated that his mother wanted them back in Juarez, that they had been dropped off at the bridge to cross back, but they did not want to return to Mexico because their mother's common-law husband was abusing them, he was involved in drug trafficking, and he was a habitual drug user.

The children's mother and Arturo "Venegas" later arrived at the bridge, and the mother was interviewed. The mother informed agents that two weeks earlier, the children's aunt (Miriam Lopez Sanchez) and the children's grandmother (Maria Del Refugio Lopez Sanchez), were with the children for a day visit in Juarez, Mexico, but they then took the children without her permission to El Paso. The mother claimed she had been trying without success to have her children returned, and that the FBI was contacted on June 18. The agents informed the mother that the case was to be investigated and the children detained in U.S. custody during the interim.

---

[7] RGL later amended his statement claiming that his mother asked his aunt if she would take the children permanently to El Paso so they could have a better life. He also claimed that his aunt agreed, but that she was too afraid to attempt to smuggle the children into the country, so they entered into the United States in "Tonio's" vehicle. RGL also claimed that he and his brothers were living at Tonio's home in El Paso. RGL also stated that Arturo "Venegas" was an Azteca gang member, had an Aztec tattoo on his stomach, he and his brother's lives are threatened because of rival gang members, and as a result they have not been to school in six months. RGL also stated that a teenage drug trafficker working for Arturo had been killed, and that he and his brothers had been living in another home in Juarez due to safety concerns.

6

On or about May 23, 2012, the children's mother attempted to intervene in the immigration proceedings taking place and filed a motion to substitute counsel arguing that Ms. Teran was not authorized to represent the children. On May 24, 2012, the Immigration Judge denied the motion to substitute counsel stating the children were in the custody of the Department of Health and Human Services and the provisions of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008[8] "remain in effect."

On July 7, 2012, the children's aunt (Ana Julia Lopez-Sanchez) signed an affidavit. In that affidavit she claimed that Arturo was violent, that Angelica and Arturo fought frequently, that Angelica would sometimes seek refuge in her home, and that Arturo would "put" the two older children "to work instead of allowing them to go to school" and made them wash cars or collect metal scraps. She also stated that the children oftentimes would go to her home looking for food, because they were not properly fed. She also stated that the police were called to Angelica's home in response to domestic violence, the children would hear Angelica and Arturo engage in sexual intercourse, and on occasions the sexual acts would take place in front of the children in their bedroom. Ana stated that on June 8, 2011, Angelica left Arturo because he became physically violent with her. She stated that Angelica asked their other sister (Miriam) to take the children to the United States. Finally, she stated that despite the previous domestic violence, Angelica returned to live with Arturo. Ana did not testify in the proceedings held in this case.

On July 11, 2011, the children's grandmother (Maria Del Refugio Sanchez) signed an affidavit. In that affidavit she stated that Angelica suffers from depression, has problems sleeping, on one occasion she saw bruises on Angelica's face, she paid the rental fees for two

---

[8] 8 U.S.C. §1232

months so that Angelica could leave Arturo, but she returned to living with him. In June 2011, the children arrived in El Paso, Texas, but a few days later Angelica wanted them returned to Mexico. As stated above, the grandmother testified in the proceedings in this Court.

On July 13, 2012, the children's father (Ramon Gonzalez Calzada) signed an affidavit stating that he objected to the asylum applications, that he did not consent to the children being represented by the St. Mary's University School of Law Immigration Clinic, that he wanted the children returned to Mexico, and that he was willing to provide the children with shelter and care. The father did not testify in the proceedings in this case, but a representation was made by Petitioner's counsel that the father objected to any asylum applications being made.[9]

The younger children were examined by Cynthia Diaz de Leon, PhD in July 2012. The two younger children reported concerns about Arturo being drunk, fighting with their mother, and "people" who are "after" Arturo. ASGL stated that he saw men with guns on occasions and that he witnessed one person being shot. SIGL stated that he was afraid his older brother and mother would be killed or kidnapped and that his mother cannot keep him safe from the "narcos." Dr. Diaz de Leon did not testify in these proceedings. The children did not inform the Court during its questioning of many of these alleged events.

On July 21, 2012, Noel Bridget Busch-Armendariz, PhD prepared an "assessment" of the three children. In this report she stated the children are victims of domestic violence. The children reported to her that Arturo threatened to kill their mother and them, have not consistently attended school because of work, and at times have been deprived of sufficient food. The children also reported witnessing sexual intercourse after their mother had been beaten. The

---

[9] On July 26, 2012, the father signed an affidavit stating he did not want the children to return to Mexico, that Angelica was still living with Arturo, and that he signed the previous statement without understanding its contents because it was in English.

children stated that their mother frequently left Arturo, only to later return. Notably, the report is silent as to drug or gang activity.

On or about July 11, 2012, the Young Center for Immigrant Children's Rights at the University of Chicago provided this Court a letter. The Young Center represented that they had been appointed as the Child Advocate for the children by the Department of Health and Human Services Office of Refugee Resettlement (ORR) pursuant to 8 U.S.C. § 1232(c)(6). Apparently based upon unspecified documents a "panel of experts" reviewed, it was recommended that the children remain in the United States. The Young Center opined that the children "suffered significant and ongoing abuse in Mexico and face a substantial risk of further harm at the hands of Arturo Quinonez" as well as by Los Aztecas, a dangerous drug cartel that has targeted the family. The Young Center also opined that the mother has failed to protect the children and that there is no one in Mexico able to protect them, including Mexican governmental authorities. No one from the Young Center testified regarding any of the opinions set forth in this letter.

## Post Notice of Appeal

On September 10, 2012, RGL signed an affidavit. In that affidavit he stated that: (1) Arturo was a drug dealer and a drug addict; (2) he formerly was associated with the Aztecas but had begun to sell on his own or for a rival gang and as a result the Aztecas gang was threatening to kill him; (3) Arturo beats his mother; (4) his mother oftentimes leaves Arturo, but returns to him; (5) his biological father was formerly associated with gangs and now is an alcoholic and a drug dealer; (6) school attendance for him and his brothers was erratic because of lack of funds; (7) the family was forced to relocate often because of gang threats and lack of rent money; (8) the boys were forced to wash and park cars, panhandle and collect scraps for money and Arturo

kept their earnings; (9) he saw Arturo selling drugs; (10) he and his brothers had to beg for food from their aunt; (11) Arturo would often yell at the children and kick them or beat them with a belt or his hands; (12) he and his brothers saw his mother and Arturo engaged in sexual intercourse; (13) Arturo smoked marijuana almost every day and took pills in front of him and his brothers; (14) Arturo once showed him a video of a man being killed; (15) Arturo kept a handgun in their home; (16) Arturo stored drugs in their home; (17) he and his brothers could not play outside of their home because of the drug-related violence in their neighborhood; (18) the police are corrupt or unreliable in Ciudad Juarez; (19) he is afraid that if he returns to Mexico, Arturo will kill him because of his testimony in these proceedings; and (20) his mother told him to lie to the undersigned judge in this case.

On September 14, 2012, the St. Mary's Center for Legal and Social Justice prepared amended asylum applications for the three children.[10] The applications sought asylum based upon "past persecution" and a well-founded fear that, if returned to Mexico, they will suffer future persecution on account of their membership in multiple social groups (namely a nuclear family who have a domestic relationship with Arturo and a nuclear family of individuals involved in Mexican drug-dealing or drug-trafficking activities).

On September 19, 2012, affidavits were signed by Alejandro Hernandez, Angelica's brother-in-law and Maria Isabel-Hernandez, Angelica's sister. In these affidavits Mr. & Mrs. Hernandez state that they visited Angelica's father's home in Ciudad Juarez and there was no evidence that Angelica had been living in that home, contrary to her sworn testimony in this

---

[10] Apparently initial I-589 Applications for Asylum and for Withholding of Removal were completed on July 6, 2012. It is not clear what became of the initial applications and they may have been rejected for technical deficiencies.

case. In addition, they indicated that Angelica's father (Enrique Lopez Morales) stated that Angelica had not lived in his home for many years.

On November 6, 2012, based upon all the documents described above and argument advanced at hearings[11], an asylum officer issued an assessment to grant asylum for the children.[12] The asylum officer found that the children had established eligibility for asylum based upon a well-founded fear of future prosecution by the drug cartels based upon the fact that the children are viewed as Arturo's stepson and this is a social group of imputed family members. The asylum officer found that drug cartels were seeking to kill Arturo and the gangs were seeking to kill (cleaning or limpieza) all those they perceived to have wronged them, including family members. The asylum officer did not assess eligibility based upon fear of Arturo claiming it was not necessary to do so.

**Post-Mandate proceedings in this case**

After receipt of the August 1, 2014 appellate court's third revised opinion and mandate, this Court allowed Petitioner an opportunity to amend her pleadings and serve the new parties. Further, the Court provided an opportunity for all parties and the ad litem to conduct discovery.

---

[11] Apparently no transcript is available from the immigration proceedings in this case.

[12] The Secretary of Homeland Security or Attorney General is authorized, in his discretion, to grant asylum to aliens who qualify as refugees. 8 U.S.C. § 1158(b)(1). An alien is a "refugee" when he is outside of his country and "is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." § 1101(a)(42)(A). In the past the Board of Immigration Appeals (BIA) has rejected arguments that "persons resistant to gang membership" and "[Salvadoran] youths who have resisted gang recruitment, or family members of such Salvadoran youth" constitute social groups, after determining that the proposed groups lacked the required social visibility. *Mendoza-Marquez v. Holder*, 345 F. App'x. 31, 32 (5th Cir. 2009). In *Mendoza-Marquez*, the Fifth Circuit concluded that the "petitioners … failed to meaningfully challenge the BIA's conclusion that membership in their family does not constitute membership in a 'particular social group' for asylum." *Id*. at 32.

Numerous conferences and discovery disputes were thereafter heard and resolved. See docket nos. 95-206. The Court set the matter for an evidentiary hearing to resolve factual disputes for April 27, 2015.

When this case was called on April 27, the Court was advised by Petitioner's attorneys that the Petitioner crossed the border with her attorney into the United States, but that she refused to board the plane for the trip from El Paso to San Antonio, Texas. "Petitioner expressed fatigue and that she feared further litigation would completely alienate her from the children, and that after the passage of such a long time, the children were acclimated to their residing in the United States."[13] Petitioner's counsel stated in open court that Petitioner was withdrawing her request for the return of the children and that she now merely sought rights of access to the children pursuant to the Hague Convention.

In light of Petitioner's withdrawal of her request to have the children returned to her, the Court instructed the parties to work out an arrangement where the children could remain in the care of the same foster family and the mother have appropriate visitation rights. The parties are unable or unwilling to work out a mutually agreeable arrangement.

**Pending Motions**

**Petitioner's Motion for Leave to File Amended Complaint (dkt. no. 202)**

In this motion Petitioner argues that "the unusual and unfortunate characteristics of the instant case make it a 'proper case' for the Court to grant meaningful rights of access to Petitioner and order the Government to fulfill its Convention-imposed duties to facilitate that access." Confusingly, Petitioner incorporates her earlier Complaints into this motion. To the

---

[13] See Docket No. 208, para. 2.

extent Petitioner attempts to revive her request for the return of the children, that request is denied inasmuch as Petitioner has previously waived that request through her attorneys and her failure to appear for the evidentiary hearing.

Petitioner relies upon Section 7 of the Convention for her argument that this Court should order the U.S. Government to provide her visitation rights. Section 7 states:

> Central Authorities shall co-operate with each other and promote co-operation amongst the competent authorities in their respective States to secure the prompt return of children and to achieve the other objects of this Convention.
>
> In particular, either directly or through any intermediary, they shall take all appropriate measures -
>
> a) to discover the whereabouts of a child who has been wrongfully removed or retained;
>
> b) to prevent further harm to the child or prejudice to interested parties by taking or causing to be taken provisional measures;
>
> c) to secure the voluntary return of the child or to bring about an amicable resolution of the issues;
>
> d) to exchange, where desirable, information relating to the social background of the child;
>
> e) to provide information of a general character as to the law of their State in connection with the application of the Convention;
>
> f) to initiate or facilitate the institution of judicial or administrative proceedings with a view to obtaining the return of the child and, in a proper case, to make arrangements for organising or securing the effective exercise of rights of access;
>
> g) where the circumstances so require, to provide or facilitate the provision of legal aid and advice, including the participation of legal counsel and advisers;
>
> h) to provide such administrative arrangements as may be necessary and appropriate to secure the safe return of the child;

> i) to keep each other informed with respect to the operation of this Convention and, as far as possible, to eliminate any obstacles to its application.

In addition, Petitioner relies upon 22 U.S.C. Section 9004 to argue that this Court should issue a provisional order to allow Petitioner visitation rights until such time as an appropriate state court assumes jurisdiction to enter orders for the conservatorship, custody, visitation and access of the children. 22 U.S.C. Section 9004 states:

> (a) Authority of courts
>
> In furtherance of the objectives of article 7(b) and other provisions of the Convention, and subject to the provisions of subsection (b) of this section, any court exercising jurisdiction of an action brought under section 11603(b) of this title may take or cause to be taken measures under Federal or State law, as appropriate, to protect the well-being of the child involved or to prevent the child's further removal or concealment before the final disposition of the petition.
>
> (b) Limitation on authority
>
> No court exercising jurisdiction of an action brought under section 11603(b) of this title may, under subsection (a) of this section, order a child removed from a person having physical control of the child unless the applicable requirements of State law are satisfied.

**Joint Motion to Dismiss (dkt. No. 209)**

All parties (except Petitioner) oppose Petitioner's motion for leave to file an amended complaint and request dismissal of this case. These parties assert that once this Court enters its Final Judgment and lifts the stay that prevents the children's removal from their current foster home, the children will be transferred to the HHS-administered Unaccompanied Refugee Minor Program, which reimburses U.S. states and private non-profit agencies the costs of placing

URMP children in foster care. Upon placement of the children into the URMP, these parties argue that an appropriate state court will determine legal custody of the children.

These parties agree that Petitioner should have reasonable access to the children. Some of the parties have expressed that they will provide reasonable support to Petitioner to arrange access to the children. The United States Government, however, opposes any mandate that would confer an immigration benefit or parole to the Petitioner.

## ANALYSIS

Notwithstanding the Petitioner's withdrawal of her request to have the children returned, some of the parties in this case insist that a ruling on the applicability of Article 13(b) of the Convention is necessary.

Article 13 states:

> Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that -
>
> a) the person, institution or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention; or
>
> b) there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.
>
> The judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views.

> In considering the circumstances referred to in this Article, the judicial and administrative authorities shall take into account the information relating to the social background of the child provided by the Central Authority or other competent authority of the child's habitual residence.

This Court refuses the invitation to make a ruling on a question that is no longer before it.

Otherwise, with regard to Petitioner's request that this Court issue a provisional order to allow Petitioner visitation rights, the Court concludes that 22 U.S.C. Section 9004(b) fails to provide this Court with this authority in this unique setting where Petitioner has waived her requests to have the children returned under the Convention. No party has cited any caselaw on this issue, and the Court has not located any cases during its research.

**Conclusion**

This case has been extremely troubling. Apparently the Petitioner lied to this Court in 2012 about having left Arturo as documentation has been presented clearly reflecting that she remains living in his household.

The children's initial testimony to this Court has been extremely elaborated upon in later proceedings to the Immigration Court and this Court. Third parties have obviously supplied this material to the children and have incorporated the allegations into affidavits signed by the children. It is questionable as to whether the children actually have personal knowledge of much of this information.

The Immigration Court was uncharitable in its treatment of the Mexican Consul and the Petitioner. Further, the Immigration Court based its asylum decision on law that appears contrary to Fifth Circuit precedent.

In her zeal to "rescue" the children, the lead attorney for the St. Mary's School of Law Center for Legal and Social Justice was openly hostile to the Mexican Consul in violation of this Court's order that he be granted access to the children for an interview. Other third party groups filed lawsuits in the state courts with no apparent authority to file these lawsuits.

Although everyone acknowledges that it is in the best interests of the children that they remain together and with the foster family that has cared for them since June 2012, the United States Government now insists that its bureaucratic mechanisms require the transfer of the children to another agency, with no real assurances that the children will remain together or under the care of the same family.

Because of the length of time this case was on appeal, the oldest child has now "aged out" of the Convention's protection and this Court now longer has any jurisdiction over him.

It is therefore ordered: (1) the petition to return the children is denied as moot; (2) Petitioner's Motion for Leave to File Amended Complaint (dkt. no. 202) is denied because any amendment would be futile inasmuch as the Court does not have authority to grant the relief requested; (3) Petitioner's motion for entry of a provisional order (dkt. no. 208) is denied; and the motion to dismiss (dkt. no. 209) is granted.

It is further ordered that until such time as a state court acquires jurisdiction with regard to the children, the Petitioner should have reasonable access to the children in such a manner as is mutually agreeable among the parties. Once the appropriate state court issues an order with respect to custody or visitation, this portion of the Order will become null. Notwithstanding the above, nothing in this Order should be construed as requiring the United States Government to grant Petitioner a parole or visa into the United States.

All parties shall bear their own costs and attorney's fees.

The appointment of the court-appointed ad litem is terminated. Within 14 days. Ms. DeVeau may file an application for fees and expenses consistent with the Order appointing her. See docket no. 81.

SIGNED this 27th day of May, 2015.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE